IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 22-261 (MFK) |
| NANOSTRING TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO NANOSTRING TECHNOLOGIES, INC.'S MOTION FOR LEAVE TO FILE SECOND AMENDED <u>ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS (D.I. 119)</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for 10x Genomics, Inc.*

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
Kdorsney@morrisjames.com
Chitch@morrisjames.com

*Attorneys for President and Fellows of Harvard College*

May 16, 2023

TABLE OF CONTENTS

Page

I. NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II. INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

III. BACKGROUND AND STATEMENT OF FACTS ......................................................... 3

    A. NIH Grant Funding and Policies ..................................................................... 3

    B. Harvard's Grant Application and The NIH Grant At Issue .................................. 5

    C. Harvard Readily Produced the Grant Materials .................................................. 7

IV. LEGAL STANDARD .................................................................................................. 8

V. ARGUMENT ............................................................................................................ 8

    A. The New Contract Theory, and All Related Claims and Defenses, Are Futile ..... 8

        1. NIH Grants Are Not Contracts ................................................................ 8

        2. NanoString Is Not an Intended Third-Party Beneficiary ......................... 11

        3. The Grant Terminated In 2016, Extinguishing Any Contract Rights That Might Otherwise Have Existed ................................................................ 12

        4. Neither 10x Nor ReadCoor Is a Party to any Putative Contract ............. 13

    B. It Is Implausible That Harvard Voluntarily Waived Its Right To Exclusively License Patents, And Obligated Itself To Grant Non-Exclusive Licenses To Everyone Who Asks ..................................................................................... 14

    C. The Attempted Monopolization and Related Cartwright Act and Unfair Competition Counterclaims (Counts 13-16) Are Also Futile ............................. 15

        1. Harvard Is Not a Competitor in the Relevant Market ............................. 16

        2. There Is No Harm to the Competitive Process ....................................... 16

        3. NanoString Does Not and Cannot Allege a Dangerous Probability of Achieving Monopoly Power .................................................................. 19

        4. NanoString's Proposed Counterclaim Counts 14, 15, and 16 Fail for the Same Reasons, as They Are All Derivative of Its Futile Sherman Act Counterclaim ....................................................................................... 20

i

VI.    CONCLUSION ........................................................................................................ 20

TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*,
   557 F.3d 483 (7th Cir. 2009) ................................................................. 13

*Accurso v. Infra-Red Servs.*,
   23 F. Supp. 3d 494 (E.D. Pa. 2014) ....................................................... 14

*Amneal Pharms. LLC v. Indivior Inc. (In re Suboxone (Buprenorphine Hydrochloride &*
   *Naloxone) Antitrust Litig.)*,
   No. 13-MD-2445, 2017 WL 36371 at *8 & n. 7 (E.D. Pa. Jan. 4. 2017)............................... 19

*Astra USA, Inc., et. al v. Santa Clara County*,
   563 U.S. 110 (2011)............................................................................... 10

*Banxcorp v. Apax Partners, L.P.*,
   No. CIV.A. 10-4769 SDW, 2011 WL 1253892 (D.N.J. Mar. 28, 2011)................................ 16

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   483 F. Supp. 3d 38 (D. Mass. 2020) ....................................................... 20

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d. Cir. 2007) ................................................... 16, 18, 19

*Cambridge Capital LLC v. Ruby Has LLC*,
   565 F. Supp. 3d 420 (S.D.N.Y. 2021) ..................................................... 13

*Chip-Mender, Inc. v. The Sherwin-Williams Co.*,
   No. C 05-3465 PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) ............................. 20

*Cooper v. Charter Communs. Entm'ts, LLC.*,
   760 F.3d 103 (1st Cir. 2014)................................................................... 12

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ................................................................ 20

*Datatreasury Corp. v. Wells Fargo & Co.*,
   490 F. Supp. 2d 756 (E.D. Tex. 2007)...................................................... 14

*Datatreasury Corp. v. Wells Fargo & Co.*,
   522 F.3d 1368 (Fed. Cir. 2008) .............................................................. 14

*Davis v. Abington Mem'l Hosp.*,
   765 F.3d 236 (3d Cir. 2014) ................................................................... 14

*EEOC v. Waffle House, Inc.*,
   534 U.S. 279 (2002) ................................................................ 14

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
   935 F.2d 1263 (Fed. Cir. 1991) ................................................ 14

*Foman v. Davis*,
   371 U.S. 178 (1962) .................................................................. 8

*FTC v. Endo Pharms. Inc.*,
   596 F. Supp. 3d 115 (D.D.C. 2022) ........................................ 17

*German Alliance Ins. Co. v. Home Water Supply Co.*,
   226 U.S. 220 (1912) ................................................................ 12

*Ginsberg v. Austin*,
   968 F.2d 1198 (Fed Cir. 1992) ................................................ 11

*Glass v. United States*,
   258 F.3d 1349 (Fed. Cir. 2001) ........................................ 11, 12

*Golden v. United States*,
   137 Fed. Cl. 155 (2018) ............................................................ 9

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*,
   747 F.3d 44 (2d Cir. 2013) ...................................................... 11

*Hon Hai Precision Indus. Co. v. Molex, Inc.*,
   No. 08 C 5582, 2009 U.S. Dist. LEXIS 9165 (N.D. Ill. Feb. 9, 2009) .................................. 18

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) .............................................. 8, 15

*In re Indep. Serv. Orgs. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000) ................................................ 17

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
   704 F.3d 927 (11th Cir. 2013) ................................................ 11

*Jackson v. Rushmore Loan Mgmt. Servs.*,
   622 B.R. 321 (Bankr. D. Mass. 2020) .................................... 14

*Kelly v. Deutsche Bank Nat'l Trust Co.*,
   789 F. Supp. 2d 262 (D. Mass. 2011) .................................... 12

*Klamath Water Users Protective Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 1999) ................................................ 11

*Lannett Co. Inc. v. KV Pharm.*,
   No. 08-338-BF, 2009 WL 10737496 (D. Del. Feb. 4, 2009) ................................... 17

*M&G Polymers USA, LLC v. Tackett*,
   574 U.S. 427 (2015)............................................................................................ 13

*Markle v. HSBC Mortg. Corp.(USA)*,
   844 F. Supp. 2d 172 (D. Mass. 2011) .................................................................. 11

*Montana v. United States*,
   124 F.3d 1269 (Fed. Cir. 1997) ...................................................................... 11, 12

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ........................................................................... 17

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ................................................................................... 8

*Pastore v. Bell Tel. Co. of Pennsylvania*,
   24 F.3d 508 (3d Cir. 1994) .................................................................................. 16

*Phillips v. WellPoint Inc.*,
   No. 10-CV-00357-JPG, 2012 WL 6111405 (S.D. Ill. Dec. 10, 2012) ................... 14

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
   117 F. Supp. 3d 613 (D. Del. 2015)...................................................................... 15

*Portney v. CIBA Vision Corp.*,
   593 F. Supp. 2d 1120 (C.D. Cal. 2008) ............................................................... 16

*Project Management Systems, Inc. v. WST Corp.*,
   No. C-89-3931-DLJ, 1991 U.S. Dist. LEXIS 11652 (N.D. Cal. 1991)................... 13

*Rambus v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) ............................................................................. 19

*Sahgai v. Univ. of Kan. Med. Ctr.*,
   2004 Kan. App. Unpub. LEXIS 107 (Ct. App. March 19, 2004)............................. 9

*SCM Corp. v. Xerox Corp.*,
   645 F.2d 1195 (2d Cir. 1981) .............................................................................. 20

*SEI Glob. Servs., Inc. v. SS&C Advent*,
   No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022).................................... 17

*Simon & Simon, PC v. Align Tech., Inc.*,
   No. 19-506 (LPS), 2020 WL 1975139 (D. Del. Apr. 24, 2020)....................... 17, 18

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) ................................................................... 17

*Tavoloni v. Mount Sianai Medical Center*,
   26 F. Supp. 2d 678 (S.D.N.Y. 1998) ........................................................ 9

*U.S. v. Children's Advocacy Center of Del.*,
   230 F. Supp. 3d 354 (D. Del. 2017)......................................................... 8

*Ultratec Inc., v. Sorenson Communs., Inc.*,
   No. 13-cv-346-bbc, 2014 U.S. Dist. LEXIS 120062 (W.D. WI., Aug. 28, 2014)....... 10, 11, 15

*Wisconsin v. Indivior Inc*. (*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*),
   No. 13-MD-2445, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017) ........................................... 20

**Other Authorities**

Rachael A. Ream, Nonprofit Commercialization under Bayh-Dole and the Academic
   Anticommons, 58 CASE W. RSRV. L. Rev. 1343 (2008) ........................................... 4

Restatement (Second) of Contracts § 302................................................................... 12

**Rules**

35 U.S.C. § 200, *et seq*................................................................................ 4

35 U.S.C. § 202 ........................................................................................ 4, 18

35 U.S.C. § 261 ....................................................................................... 14

42 U.S.C. § 241 ....................................................................................... 8

## I.  NATURE AND STAGE OF THE PROCEEDINGS

On May 2, 2023, NanoString filed a motion for leave to file a second amended answer, affirmative defenses, and counterclaims (D.I. 119 ("Motion")). That Motion should be denied.

## II.  INTRODUCTION AND SUMMARY OF ARGUMENT

Hoping to stave off an imminent injunction in Germany for its infringement of Harvard's patents, NanoString has conjured a new theory that attempts to twist Harvard's receipt of NIH funds to bar the sort of exclusive licensing expected and encouraged by the NIH and federal law. NanoString's contention is that, through an NIH grant that Harvard obtained, Harvard somehow waived its rights to exclusively license *any and all patents* that might arise from the grant-funded research. Further, Harvard purportedly obligated itself to give NanoString, Vizgen, and, apparently, anyone else in the world who might ask non-exclusive licenses to the patent rights that Harvard exclusively licensed to 10x. The new theory is implausible on its face.

In 2009, Harvard received a five-year funding grant from the NIH. Through that funding, Dr. George Church's team at Harvard produced innovations that are now revolutionizing genomics—reflected in nearly 40 publications (including in leading journals like *Science*, *Cell*, and *Nature*) and more than 50 patent filings. *See* D.I. 119-6 at VIZ100332-34 and VIZ100327-330. A portion of the patents derived from that work were exclusively licensed to a small startup company, ReadCoor, giving ReadCoor the protection it needed to get a prototype off the ground while securing royalties that support Harvard's ongoing research efforts. Years later, 10x, an established innovator in single-cell genomics, acquired ReadCoor and invested tens of millions more in capital to bring Harvard's inventions to market.

Harvard's application for the NIH funding included statements that Dr. Church would "work with" Harvard to "try" for and "pursue" non-exclusive licensing. The statements are aspirational in nature, are not specific to patents, and reflect the expected commitment to the

sharing of data and non-patented research tools promoted by established NIH policies. NanoString seizes on these statements in its proposed pleading, attempting to contort them into a binding contractual requirement that neither the NIH nor the law would recognize: a perpetual obligation to license to all comers, worldwide, any and all future grant-related patents, enforceable against Harvard not only by the NIH, but by third parties like NanoString. NanoString stretches further to bind 10x (not a party to the NIH-Harvard award) to this alleged contract and contends that Harvard's and 10x's refusal to grant a license seven years after the grant expired is not only a breach of contract but an antitrust violation. This new theory cannot survive Rule 12, and the proposed amendment is correspondingly futile, for a host of reasons.

First, this type of NIH grant is a funding award governed by statute. Applicable statutes, regulations, and policy statements define the NIH-grantee relationship and establish appropriate administrative remedies for violations of award terms. The funding award is not a contract and is not governed by contract law. It creates no enforceable contractual rights.

Second, even if the grant application and award were deemed a contract, NanoString is not a party with rights to enforce it. NanoString is also not an intended third-party beneficiary. Government contracts operate for the benefit of the public and naturally involve a multitude of **incidental** beneficiaries that by law have no right to enforce. Only in the rare case where a government contract expressly confers upon a third party a right to enforce the contract directly will a court treat that person as an **intended** third-party beneficiary with standing to sue.

Third, even if the grant were a contract, the "contract" expired in July 2016. NanoString identifies no survival clause, and the award itself provides otherwise—the remedy for any alleged breach by Harvard was the potential withholding of funds by the NIH, a threat that expired with the grant itself.

Finally, and independent of whether purported terms of the funding grant could be enforced years after the grant's expiration, the selected quotes from the grant application that NanoString relies on do not plausibly obligate Harvard to give NanoString or any other third party a license to the specific patents exclusively licensed to 10x. The grant application could at most be read to say that non-exclusive licensing (and not necessarily of patents) would be "tried" or "pursued" in a general sense—but not that Harvard waived its rights to grant exclusive licenses. There is no plausible explanation for why Harvard and the NIH would choose to constrain themselves in such a way—a way that runs counter to established NIH policies and the objectives of the Bayh-Dole Act, which governs this type of research funding—and then allow third parties, like NanoString, to infringe Harvard patents and compel the grant of a license when caught in the act. Certainly, if that were the intent, Harvard and the NIH would not have documented it so obliquely.

Against this backdrop, none of the new counterclaims or defenses proposed by NanoString can survive Rule 12. NanoString's antitrust and state tort claims—which hinge on the same implausible theory—also fail, both because they are derivative of the meritless breach of contract claims and because NanoString does not, and cannot, plead the elements of attempted monopolization as a matter of law.

## III. BACKGROUND AND STATEMENT OF FACTS

### A. NIH Grant Funding and Policies

Like most major research institutions, Harvard receives significant grant funding from the NIH, which is a part of the U.S. Department of Health and Human Services ("HHS"). These funds provide the foundation for basic research and the conception of patentable inventions that would not otherwise be commercialized. In 1980, Congress passed the Bayh-Dole Act to promote innovation and enable "the transfer of intellectual property rights from academia to

industry where they can be commercialized and made more readily available to the public."[1] As Senator Bayh explained on the day that he introduced the bill to the Senate floor:

> A wealth of scientific talent at American colleges and universities . . . is going to waste as a result of bureaucratic red tape and illogical government regulations. . . . **Unless private industry has the protection of some exclusive use under patent or license agreements, they cannot afford the risk of commercialization expenditures.**[2]

In line with this objective, Bayh-Dole expressly grants non-profit organizations that develop inventions with federal funding the right to retain title to those inventions. 35 U.S.C. § 202. The Act provides for a process by which non-profits may disclose such inventions to the government, obtain patent protection, and then license those rights to for-profit companies to commercialize products for the public's benefit. *See* 35 U.S.C. § 200, *et seq*.

Pursuant to the Act, the NIH has promulgated regulations and policies to ensure that grantees retain title to patented inventions arising from NIH grants and that such inventions are commercialized through patent licensing—including exclusive licenses. *See* Ex. 1, NIH Policy[3] at 113 ("As long as grantees abide by the provisions of the Bayh-Dole Act .... they have the right to retain title to any invention conceived or first actually reduced to practice using NIH grant funds."). At the same time, the NIH has also long required that underlying data and non-patented materials ("research tools") arising from NIH-funded research be shared openly with other academics. NIH regulations and policies strike a balance between providing incentives to

---

[1] Rachael A. Ream, Nonprofit Commercialization under Bayh-Dole and the Academic Anticommons, 58 CASE W. RSRV. L. Rev. 1343 (2008).

[2] Ex. 6 (Senator Birch Bayh, Introductory statement on Bayh-Dole Act (Sept. 13, 1978)).

[3] All references herein are to the 2003 *NIH Grants Policy Statement* (the "NIH Policy"), which was the operative version of the policy when the grant at issue here was awarded. *See* Ex. 2, [https://grants.nih.gov/grants/guide/notice-files/NOT-OD-11-003.html] (explaining that the 2003 *NIH Grants Policy Statement* set forth the terms and conditions for NIH grants funded between Dec. 1, 2003 and Sept. 30, 2010.). Of note, the NIH Policy is itself referenced in the grant award and incorporated as part of the terms and conditions. D.I. 119-4 at VIZ00099753-754; Ex. 5 (VIZ00099753-754 resized so that the ECF stamping does not obscure item d. at VIZ00099754).

commercialize technologies for the benefit of the public under Bayh-Dole while assuring that

basic research materials remain accessible to other researchers:

> The regulation requires the grantee to use patent and licensing processes to transfer grant supported technology to industry for development. Alternatively, unpatented research products or resources—"research tools"—may be made available through licensing to vendors or other investigators. Sharing of copyrightable outcomes of research may be in the form of journal articles or other publications.

Ex. 1, NIH Policy at 113-114.

Further confirming this balance, the NIH Policy includes, *e.g.*, sections entitled "Sharing

of Research Data" and "Sharing of Unique Research Resources" that require grantees to share

data and unpatented materials upon publication. *See* Ex. 1 (NIH Policy) at 115. Meanwhile, the

section "Inventions and Patents" reaffirms that grantee own patented inventions arising from

NIH grants and that commercialization efforts should be made through patent licensing. *See id.*

at 116-17. NIH policy also requires that grantees submit "Invention Utilization Reports" that

provide the NIH with information on commercialization efforts. *See id.* at 133. These reports

inform the NIH of successfully executed exclusive licenses among other commercialization

activities encouraged by the NIH.

## B. Harvard's Grant Application and The NIH Grant At Issue

The grant Harvard received was consistent with the NIH's policies and objectives. The

NIH did not narrow or reduce the patent-licensing rights to which Harvard was entitled to under

Bayh-Dole. Such a deviation would have been inconsistent with NIH policies requiring Harvard

to "[m]ake efforts to commercialize [a] subject invention through patent or [*sic*] licensing." Ex. 1

(NIH Policy) at 117. Indeed, the incentive of an exclusive license is often necessary to induce the

investment of capital needed for such commercialization, as evidenced by the fact that NIH itself

makes its own, government-owned patents available for exclusive licensing.[4]

Harvard's grant application simply reflected a commitment to share data and non-patented research tools, as already required under the NIH Policy. Instead of precluding exclusive licenses, the grant includes only aspirational statements that Dr. Church would "work with" Harvard to "try" to enter and "pursue" non-exclusive licensing—and not even specifically with respect to patents.[5] The language relied on by NanoString does not show otherwise.

NanoString relies on a section of the "Data Materials Dissemination Plan" that makes no mention of patented inventions. That section, "Software, protocol, and data sharing" (D.I. 119-4 at VIZ00099686), describes how the proposed research center "will openly share **software, protocols and data**" and how "**programs** will be generally available" and "distributed freely to academics." While the section includes language concerning non-exclusive licensing (potentially of copyrights, software, or data—which is what this section is about) the purported "promise" is limited to an aspiration that the lab "**will try** to move our technology either into the public domain or nonexclusive licensing mechanisms well before they would be normally publishable." The DMDP goes on to include a "Commercialization" section reiterating that the center "will pursue open and non-exclusive licensing agreements" relating to innovations "[a]s described above" (*i.e.,* the section concerning software and data and not patents). *Id*. at VIZ00099687.

NanoString also points to Dr. Church's aspiration to "work with" Harvard's technology transfer office to "obtain open and non-exclusive licenses that will encourage commercialization

---

[4] *See* Ex. 3 [https://www.techtransfer.nih.gov/licensing] ("Nonexclusive and Exclusive Patent Licenses allow a company to commercialize the invention, under appropriate circumstances pursuant to applicable statutes and regulations.").

[5] NanoString has not pleaded, and could not plead, that Harvard has granted only exclusive licenses to the patent portfolios that have been derived from the grant at issue. To the contrary; Harvard has entered into numerous **non**-exclusive licenses to patents that arose from the grant application at issue, along with entering into the exclusive license with ReadCoor.

of these innovations"—yet again, this section is not expressly directed to patent rights (technology transfer offices routinely license software, data, and copyrights), and includes no specific promise or commitment. D.I. 119-4 at VIZ00099689-90.

In fact, the only explicit reference to **patents** on which NanoString relies is a generic recitation of the fact that Dr. Church has obtained patents in the past, and has worked to commercialize innovations before—without making any licensing commitment whatsoever:

> Professor Church has been on the Harvard-wide Copyright and Patent Committee (CPC) for years, a recipient of numerous successful patents, and is in constant contact with the HMS Office of Technology Licensing (OTL). More generally, we will encourage close relationships with companies who can promote broad usage of innovations by incorporating them with other technology into readily usable packages and applications. Professor Church is currently on Scientific Advisory Boards of fifteen companies and has maintained close relationships with many others. He will use these close relationships to encourage companies to adapt CTCHGV innovations into their products, as he did in the prior MGI CEGS.

D.I. 119-4 at VIZ00099687.

That the grant award in this case stated that "the data and materials sharing and release plans" were a "condition of this award" was nothing more than a confirmation of NIH policy requiring sharing of data and materials and did not dictate any restriction on patent licensing. D.I. 119-4 at VIZ00099748. Neither Harvard nor NIH agreed to depart from NIH's ordinary commercialization policy (and the framework of Bayh-Dole) and eliminate the possibility of exclusive patent licenses. The parties' subsequent conduct is fully consistent with NIH's established policy and inconsistent with the radically altered legal framework that NanoString alleges:  Harvard submitted Invention Utilization Reports to the NIH disclosing the grant of the exclusive license to ReadCoor. Ex. 4 (stating "1" in response to "In the designated reporting period, how many exclusive licenses and/or options are active?"). And the NIH did not notify Harvard of a failure to comply with its grant obligations upon learning of the exclusive license.

**C.  Harvard Readily Produced the Grant Materials**

With no plausible support in the grant itself, NanoString attempts to give its new theory more credence by arguing that Harvard tried to conceal the grant materials in discovery. D.I. 119-1, ¶¶ 175-176. Yet NanoString admits that it "did not prioritize" discovery on the grant materials—despite acknowledging their existence – and it failed to serve document requests to which the grant materials were responsive. D.I. 114. Harvard produced the grant materials to Vizgen in January in response to its specific requests, and, when NanoString requested them for the first time in April, Harvard produced them promptly to NanoString as well.

## IV. LEGAL STANDARD

Although the court should "freely give[] [leave to amend] when justice so requires," a motion to amend should be denied when futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). A pleading is futile if it "does not state a claim upon which relief can be granted." *U.S. v. Children's Advocacy Center of Del.*, 230 F. Supp. 3d 354, 356 (D. Del. 2017) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). In assessing futility, the court should "appl[y] the same standard of legal sufficiency as it applies under Rule 12(b)(6)." *Burlington*, 114 F.3d at 1434.

## V. ARGUMENT

### D. The New Contract Theory, and All Related Claims and Defenses, Are Futile

#### 1. NIH Grants Are Not Contracts

Grants awarded by the NIH are governed by the statutory and regulatory framework authorized by Congress, not contract law. As stated in the grant award itself, the grant was made pursuant to 42 U.S.C. § 241 (D.I. 119-6 at VIZ00100362). Section 241 distinguishes between "grants" and "contracts," and authorizes the Secretary of Health and Human Services, on one hand, to "make grants-in-aid," and, on the other, to "enter into contracts." 42 U.S.C. § 241. That "grants" are not "contracts" is a meaningful distinction—and courts routinely decline to apply

contract law principles to grants (which are governed by the statutory and regulatory framework of the applicable funding agency). For instance, in *Golden v. United States*, the U.S. Court of Federal Claims rejected the assertion that NSF and NIH grants are contracts:

> The [] characterization of a NSF grant as a contract is incorrect. *Compare* 31 U.S.C. § 6304 ('An executive agency shall use a grant agreement . . . when . . . substantial involvement is not expected between the executive agency and the . . . recipient when carrying out the activity contemplated in the agreement.'), *with* 31 U.S.C. § 6303 (describing the circumstances, inapplicable here, under which agencies are required to use 'procurement contracts').

137 Fed. Cl. 155, 176 n.21 (2018). *See also, id.* at 180 n. 27 ("As previously explained, the . . . characterization of a NIH grant as a contract is incorrect.").

*Tavoloni v. Mount Sinai Medical Center* is particularly instructive here, as the court dismissed a claim for breach by a purported third-party beneficiary to an NIH grant. 26 F. Supp. 2d 678, 680 (S.D.N.Y. 1998). The court found the NIH grant was not governed by contract law:

> Dr. Tavoloni's final claim is that he is entitled to sue as a third-party beneficiary for alleged breach of a contract between the National Institutes of Health and Mt. Sinai, specifically a 1989 NIH grant. The grant in question was an award by the Public Health Service through the NIH pursuant to 42 U.S.C. § 241 and part 52 of title 42 of the Code of Federal Regulations. As several courts have held, such grants are **governed by statute, not contract law**. The measure of plaintiff's rights therefore is the statute and regulations thereunder, not principles of contract. As plaintiff has pointed to nothing in the applicable statute and regulations that gives rise to any right to relief, this claim must be dismissed.

*Tavoloni,* 26 F. Supp. at 683 (emphasis added). *See also, Sahgai v. Univ. of Kan. Med. Ctr.*, 2004 Kan. App. Unpub. LEXIS 107 (Ct. App. March 19, 2004) (". . . NIH Grants do not support claims for breach of contract. . ." (citing *Tavoloni*, 26 F. Supp. 2d 678 (S.D.N.Y. 1998)).

That NIH grants are governed by federal statutes and regulations and not contract law is also made plain by the NIH Policy, which enumerates the limited remedies available to a grantee or NIH. *See* Ex. 1, NIH Policy at 136-39 (setting forth the procedures for "Enforcement Actions" due to "[a] grantee's failure to comply with the terms and conditions of award."). The remedies available include "Suspension, Termination, and Withholding of Support," and the NIH Policy

further provides a process for administratively appealing adverse determinations within HHS. *See* Ex. 1, NIH Policy at 141-42 ("Grant Appeals Procedures"). Notably missing is the notion that a grantee or the NIH, let alone a third party, could sue for breach of contract.

The Supreme Court has recognized that where a relationship between a private party and the government is prescribed by statute, the "absence of a private right to enforce" would be rendered "meaningless" if Courts allowed an end-run to such statutory frameworks by endorsing breach-of-contract claims by purported third-party beneficiaries. *See Astra USA, Inc., et. al v. Santa Clara County*, 563 U.S. 110, 118 (2011) (reversing the allowance of third-party contract claims brought by counties on theory that alleged breaches instead violated **statutory** framework reflected in agreements between government and pharmaceutical manufacturers).

In *Ultratec Inc., v. Sorenson Communs., Inc.*, No. 13-cv-346-bbc, 2014 U.S. Dist. LEXIS 120062 (W.D. WI., Aug. 28, 2014), defendants in a patent infringement suit sought to claim, as NanoString does here, that the patent holder's representations to a government agency to license its patents created a binding contract. Like here, defendants attempted to liken the patent holder's statements to FRAND commitments made to standard-setting organizations to assert that the patent holder had committed to license its patents on "fair, reasonable, and non-discriminatory" terms. The *Ultratec* court found instead:

> Unlike private standards setting organizations, the commission [FCC] is a governmental entity and decisions or rules made by the government are not often contracts, even when they appear to be. For a contract to exist, the governmental entity must have the authority to enter into the contact, and there must be clear evidence that it intended to create a contract rather than to promulgate policies and regulations.

*Id.* at *16 (citations omitted). The Court ultimately did not need to reach the question of whether the contract existed because "Even if I assume that it does, I conclude that the purported contract did not require plaintiff Ultratec to license its patents to defendants and that defendants were not intended third party beneficiaries to the purported contract." *Id.* at *17. Like here, there was no

clear evidence that the government and patent holder intended to enter into a contract rather than to abide by the normal policies and procedures associated with the grant. Because the grant is, as a matter of law, governed by statute and not contract law, NanoString's proposed counterclaim XVII and the state law and antitrust claims that are derivative of that theory would be futile.

## 2.   NanoString Is Not an Intended Third-Party Beneficiary

Even if the grant could be deemed a contract, NanoString is neither a party to it nor an **<u>intended</u>** third-party beneficiary entitled to enforce it. Under Federal common law,[6] "[p]roving third-party beneficiary status requires that the contract terms 'clearly evidence[] an intent to permit enforcement by the third party' in question.'" *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*, 747 F.3d 44, 49 (2d Cir. 2013); *see also Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir. 2013) (third parties to government contracts "are generally assumed to be incidental beneficiaries" (citing *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999)). To overcome the presumption that third parties to government contracts are mere incidental beneficiaries, the third party must show that the contracting parties "clear[ly] inten[ded]" that the third party "be permitted to sue to enforce the [] Agreement." *Interface Kanner*, 704 F.3d at 933 (citation omitted); *Ultratec*, 2014 U.S. Dist. LEXIS 120062 at *25.[7]

---

[6] "It is well settled that contracts to which the government is a party [] are normally governed by federal law, not by the law of the state where they are made or performed." *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992). Whether federal or Massachusetts law governs interpretation of the grant is immaterial "because both Massachusetts law and federal common law follow the Restatement (Second) of Contracts to assess the rights of third-party beneficiaries." *Markle v. HSBC Mortg. Corp.(USA)*, 844 F. Supp. 2d 172, 180 (D. Mass. 2011).

[7] While the Federal Circuit did not apply this presumption to the state of Montana's third-party beneficiary status in *Montana v. United States*, 124 F.3d 1269 (Fed. Cir. 1997) or to shareholders of a mortgage corporation in *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), it did so because the claimants to third-party beneficiary status in those cases were not doing so as mere members of the public. The court reaffirmed the general rule that "members of the public

Courts applying Massachusetts law to government contracts apply the same presumption set forth in *Interface Kanner*, finding the presumption is overcome "only where the contract and circumstances of the contract **make it particularly clear** that the parties intended members of the public to **possess enforcement power**." *Cooper v. Charter Communs. Entm'ts, LLC.*, 760 F.3d 103, 109 (1st Cir. 2014); *see also*, *Kelly v. Deutsche Bank Nat'l Trust Co.*, 789 F. Supp. 2d 262 (D. Mass. 2011).

NanoString does not, and cannot, plead that it is an **intended** beneficiary of the grant. NanoString is not mentioned in the grant. The purpose of the grant, moreover, was to fund basic research, not guarantee NanoString a license to patents that did not even exist (and may never have existed at all) at the time of the award. The only potential consequence for a failure by Harvard to comply with its data-sharing plan—termination of the award—necessarily leaves enforcement power with the NIH rather than the public at large. While the public is expected to benefit incidentally from NIH efforts to fund innovation (and indeed NanoString and the public have benefitted), the NIH and Harvard did not bestow a right to force Harvard to grant a patent license to NanoString or any specific member of the public against Harvard's judgment.

### 3. The Grant Terminated In 2016, Extinguishing Any Contract Rights That Might Otherwise Have Existed

Even if NanoString could establish that the grant is a contract and that NanoString was an

---

are considered to be incidental beneficiaries unless they can show a direct right to compensation." *Montana*, 124 F.3d at 1273, n.6. Here, NanoString's argument rests on the notion that any member of the public is entitled to a non-exclusive license to the asserted patents, so the presumption applies. D.I. 119-1 ¶¶ 232-233, 236. Even under *Montana* and *Glass*, third-party beneficiary status remains an "'exceptional privilege' and, to avail oneself of this exceptional privilege, a party must 'at least show that [the contract] was intended for his **direct** benefit.'" *Glass*, 258 F.3d at 1354 (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)) (emphasis added); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 302. There is nothing in the pleadings, grant application, or award to suggest NanoString was directly intended as a beneficiary and the claim fails under either articulation of the test.

intended third-party beneficiary, it would still have no claim because the grant terminated upon the conclusion of the project period in July 2016. D.I. 119-6 at VIZ00100362. The grant contained no "survival clause" for the alleged promises on commercialization. Without a clear intention to extend such promises beyond termination, any obligation expired in July of 2016.

The law "generally disfavors perpetual contracts," *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 486 (7th Cir. 2009) meaning "courts should not construe ambiguous writings to create lifetime promises." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441 (2015) (citation omitted). In *M&G Polymers*, the Supreme Court underscored the "traditional [contract law] principle" that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 441-42 (citation omitted).

Here, the grant application shows no intent to extend any promise beyond the grant period. The NIH limited the remedy for breach to "termination of the award" which was fully disbursed by 2016. D.I. 119-6 at VIZ00100367. Per NIH Policy, post-grant obligations are limited to regulatory matters such as the reporting due to the agency under the Bayh-Dole Act. Any licensing obligations that might have existed would have expired with the grant in 2016, and NanoString cannot plausibly plead otherwise.[8]

### 4. Neither 10x Nor ReadCoor Is a Party to any Putative Contract

Moreover, even if this Court were to find that the grant was a "contract," the parties to the alleged contract are Harvard and NIH; 10x was never a party, and neither was ReadCoor. As

---

[8] *See e.g., Project Management Systems, Inc. v. WST Corp.*, No. C-89-3931-DLJ, 1991 U.S. Dist. LEXIS 11652, *12-13 (N.D. Cal. 1991) ("The plaintiff has failed to establish all the elements of breach of contract because no contract existed after its lawful termination. . . Therefore, the defendant's failure to pay the plaintiff commissions [after expiration] does not constitute a breach of the agreement."); *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 469 (S.D.N.Y. 2021) ("The NDA expired on April 11, 2020, and with its expiration so too did [party's] obligations under the NDA. That is the meaning of the termination of a contract.").

a matter of fundamental contract law, 10x cannot be held liable for purported breach of the grant. *See, e.g.*, *Accurso v. Infra-Red Servs.*, 23 F. Supp. 3d 494 (E.D. Pa. 2014) (one cannot be liable for breach of contract unless one is a party to the contract); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *see also Phillips v. WellPoint Inc.*, No. 10-CV-00357-JPG, 2012 WL 6111405, at *9 (S.D. Ill. Dec. 10, 2012) ("As a basic principle of contract law, a non-party cannot be held liable for a breach of contract."); *Jackson v. Rushmore Loan Mgmt. Servs.*, 622 B.R. 321, 331 (Bankr. D. Mass. 2020).

The license of patents to ReadCoor and the subsequent acquisition by 10x does not make ReadCoor (or 10x) a party to the grant. By statute, patents are treated as personal property, *see* 35 U.S.C. § 261, not real property, and covenants do not run with patents the way covenants might run with the land. *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 935 F.2d 1263, 1268 (Fed. Cir. 1991). 10x's acquisition of the patent license from ReadCoor therefore does not make 10x a party to the NIH grant or subject 10x to any alleged obligations within it. *Datatreasury Corp. v. Wells Fargo & Co.*, 490 F. Supp. 2d 756, 764 (E.D. Tex. 2007) ("This finding that the PLA [Patent License Agreement] did not 'run with' the 007 Patent comports with the Congressional policy that patents are to be treated like personal property."), *aff'd*, *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372-73 (Fed. Cir. 2008). As a non-party to the grant, 10x cannot be held to have "breached" it.

### E.  It Is Implausible That Harvard Voluntarily Waived Its Right To Exclusively License Patents, And Obligated Itself To Grant Non-Exclusive Licenses To Everyone Who Asks

Over and above these deficiencies, NanoString's Motion to Amend should be denied because its new counterclaims and affirmative defenses rest on an implausible theory. To survive scrutiny under Rule 12(b)(6), a pleading "must do more than simply" make conclusory allegations. *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (citation omitted).

14

Where an allegation arises from a contract,[9] "[t]he court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiffs' allegations in a complaint" or otherwise precludes the claims. *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015); *Burlington*, 114 F.3d at 1426.

In this case, NanoString's new proposed theory hangs on the premise that Harvard made a specific, binding promise to license "any patents" resulting from the NIH grant. D.I. 119-1 ¶ 232. But NanoString conflates NIH regulatory requirements concerning the sharing of **data and materials** (or "research tools") with Harvard's practices to encourage commercialization of federally-funded discoveries through patent licensing. (*See* Section III.B., above).

No reasonable person could construe the generic licensing aspirations in the grant application—which were freighted with caveats like "try to" and "pursue" and "work with" that are not remotely consistent with a binding promise and in any case never directed specifically to patents—as a waiver of Harvard's ability and obligation to ensure the commercialization of patented inventions discovered through federally-funded research, including through exclusive licensing. *See* Sections III.A.-III.B., above. These statements cannot plausibly be read as a binding promise to license any and all arising patents to anyone who asks at any time, including after they have sold infringing products and have been sued for it. *See id.*

NanoString's implausible treatment of the grant application undergirds all the new counterclaims and defenses NanoString seeks to assert through amendment. NanoString's request to enforce the grant is legally unsupportable and the Motion should be denied in full.

### F.  The Attempted Monopolization and Related Cartwright Act and Unfair Competition Counterclaims (Counts 13-16) Are Also Futile

---

[9] As explained above, the Grant was not governed by contract law, but instead by the statutory and regulatory framework authorized by Congress. The Court need not reach this issue if it finds NanoString's contentions implausible. *See Ultratec*, 2014 U.S. Dist. LEXIS 120062 at *17.

### 5.   Harvard Is Not a Competitor in the Relevant Market

NanoString contends that 10x and Harvard attempted to monopolize the purported market for "single-cell spatial transcriptomics" ("SST").[10] An attempted monopolization claim cannot be asserted against Harvard because it is not a competitor in this market. "[E]ssential to a claim for monopolization or attempted monopolization is a requirement that the defendant be a participant of the relevant market and have a share in it." *Banxcorp v. Apax Partners, L.P.*, No. CIV.A. 10-4769 SDW, 2011 WL 1253892, at *6 (D.N.J. Mar. 28, 2011) (collecting cases); *see also Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994); *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1127–28 (C.D. Cal. 2008) (dismissing attempted monopolization counterclaim against patent holder who sought royalties from product sales but who did not produce or sell products or hold market share in the relevant market). NanoString does not allege that Harvard is a competitor. D.I. 119-1 ¶¶ 184–185 (identifying only three SST market participants—NanoString, Vizgen, and 10x).

### 6.   There Is No Harm to the Competitive Process

The Court should also reject NanoString's proposed antitrust counterclaim because it fails to (and cannot) plead harm to the competitive process. To plead an attempted monopolization claim, a plaintiff must allege (1) predatory or anticompetitive conduct that harmed competition, with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308, 317 (3d. Cir. 2007). A plaintiff must actually plead—and ultimately prove—harm to the competitive process under prong one, and no such harm is pleaded here. *See, e.g.*, *id.* at 308, 316 ("Conduct that merely harms competitors, however, while not harming the competitive process

---

[10] 10x and Harvard do not concede that "SST" is a properly defined, relevant market and reserve the right to challenge that alleged market at the appropriate time.

itself, **is not anticompetitive**") (emphasis added) (citations omitted).[11]

NanoString fails to allege anticompetitive conduct. Instead, NanoString's proposed counterclaim rests on a litany of lawful conduct: allegations that Harvard and 10x formed an exclusive license, refused to license to NanoString, or sued NanoString for infringement do not establish anticompetitive conduct at all, *absent additional circumstances that convert lawful conduct into exclusionary conduct*, which simply are not present here.[12] *See generally Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-75 (10th Cir. 2013) ("[E]ven a monopolist generally has no duty to share (or continue to share) its intellectual . . . property with a rival"); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325-28 (Fed. Cir. 2000) (patent owner generally has no obligation to license patent rights); *FTC v. Endo Pharms. Inc.*, 596 F. Supp. 3d 115, 121 (D.D.C. 2022) (same); *see also Lannett Co. Inc. v. KV Pharm.*, 2009 WL 10737496, at *6 (D. Del. Feb. 4, 2009) ("Because a patentee has a lawful monopoly over an invention, antitrust liability cannot flow from conduct that is permissible under the patent laws.").

This case law is precisely why in antitrust cases involving the exercise of patent rights, the Third Circuit requires a plaintiff to actually plead and prove anticompetitive conduct—conduct that harms the competitive process—and not merely conduct that amounts to a simple

---

[11] *See also Simon & Simon, PC v. Align Tech., Inc.,* No. 19-506 (LPS), 2020 WL 1975139 at *4 (D. Del. Apr. 24, 2020) (same); *cf. SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 WL 2356730, at *2 (3d Cir. June 30, 2022) (affirming dismissal of antitrust claim because plaintiff's allegations focus on injuries to plaintiff rather than competition in general and observing that "it is only . . . a competition-*reducing* aspect or effect of the defendant's behavior, that antitrust laws seek to curtail") (citations omitted); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 65–66 (1st Cir. 2004) (Sherman Act claim involving an allegedly illegal exclusive contract "require[d] a showing of injury to competition . . . . [This] does not mean a simple loss of business [for the plaintiff] or even the demise of a competitor but *an impairment of the competitive structure of the market*") (emphasis added).

[12] For example, NanoString's proposed counterclaims do not assert fraud on the PTO or sham litigation—and indeed, they could not legitimately do so.

exercise of market power conferred by a patent itself. *Broadcom*, 501 F.3d at 314-17. NanoString does not allege anything that satisfies that requirement.

In an attempt to shoehorn Harvard's and 10x's lawful exercise of their IP rights into an "anticompetitive conduct" theory, NanoString alleges that the NIH grant process provides it with a right to a non-exclusive license to any patents arising from NIH funding, such that Harvard's (and 10x's) denial of the license constitutes anticompetitive conduct. This theory fails as a matter of law. As discussed at pages 8-14 above, NanoString has no right to enforce any part of the NIH grant: NanoString is not an intended third-party beneficiary, and it has no right (contractual or otherwise) to a license to the Asserted Patents.[13] Thus, a refusal to grant a license to NanoString cannot be anticompetitive conduct because *NanoString never had a right to the license in the first place. See*, *e.g.*, *Simon & Simon, PC*, 2020 WL 1975139, at *5 (decision not to supply to competitor cannot constitute anticompetitive conduct where the competitor has no right to the supply). Moreover, NanoString cannot credibly allege that a refusal to license the Asserted Patents is anticompetitive when the regulatory scheme that governs funding by the NIH expressly authorizes funding recipients to retain ownership over the results of their research. *See* 35 U.S.C. § 202; *see also* discussion, *supra* at Section V.A.

NanoString likewise cannot plausibly recast the facts here as within the ambit of the Third Circuit's decision in *Broadcom v. Qualcomm*. In *Broadcom*, the court held that Qualcomm's false promises to a standard-setting organization ("SSO"), which had the effect of

---

[13] Even if NanoString had a contractual right to license the Asserted Patents (it does not), the mere breach of a contract is not typically actionable anticompetitive conduct under § 2. *See Hon Hai Precision Indus. Co. v. Molex, Inc.*, No. 08 C 5582, 2009 U.S. Dist. LEXIS 9165, at *7 (N.D. Ill. Feb. 9, 2009) (holding that defendant's breach of agreement to license "necessary claims" to plaintiff "d[id] not constitute predatory or anticompetitive conduct" and dismissing attempted monopolization claim).

inducing the SSO to incorporate a specific proprietary technology into an industry-wide standard, could give rise to a Section 2 claim for monopolization. Critically, and consistent with other cases involving fraud on SSOs, the Third Circuit based its decision on the concern that *when an SSO selects technology to incorporate into a standard, it eliminates all competitive alternatives to that technology*. *Broadcom*, 501 F.3d at 316–17; *see also Rambus v. FTC*, 522 F.3d 456, 463–67 (D.C. Cir. 2008).

"[T]he unique dangers of deception *in the standard-setting context*" that the Third Circuit was concerned about do not exist here. *Broadcom*, 501 F.3d at 312. The NIH is not an SSO. The NIH did not establish an industry-wide standard that required the use of Harvard's patented technology. Nor are there any allegations that the Asserted Patents are "essential" to competing in the SST market.[14] NanoString's attempt to apply *Broadcom* to this case simply doesn't work. *See*, *e.g.*, *Amneal Pharms. LLC v. Indivior Inc.*, No. 13-MD-2445, 2017 WL 36371 at *8 & n. 7 (E.D. Pa. Jan. 4. 2017) (explaining that "*Broadcom* was decidedly narrow and its applicability is confined to its unique factual circumstances") (citations omitted).

### 7. NanoString Does Not and Cannot Allege a Dangerous Probability of Achieving Monopoly Power

Finally, NanoString's proposed antitrust counterclaim fails because it cannot allege a dangerous probability of achieving monopoly power, the third required element of its claim. NanoString alleges that *if* Harvard and 10x succeed in their litigation, then 10x "will have a 100% share of the global SST market." D.I. 119-1 ¶ 207. But this theory cuts off NanoString's attempted monopolization claim at the knees. If Harvard and 10x prevail, any monopoly so achieved will be a *legal* one, not subject to the Sherman Act. *See SCM Corp. v. Xerox Corp.*, 645

---

[14] Quite to the contrary, NanoString denies that it infringes 10x's patents at all. *See* D.I. 119-1, at 10-11 (First Defense – Non-Infringement); *id.* at 14-22 (Declarations of Non-Infringement).

F.2d 1195, 1206 (2d Cir. 1981). Courts have rejected similar attempts to allege a dangerous probability of success where the only prospect of achieving monopoly power is through success in patent infringement litigation. *See, e.g., Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 65 (D. Mass. 2020) (possibility of attaining market power through successful patent infringement litigation was not a dangerous probability of success for Section 2 purposes); *Chip-Mender, Inc. v. The Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058 (N.D. Cal. Jan. 3, 2006) (finding allegations of a dangerous probability of success insufficient where plaintiff alleged only that monopoly power would be achieved through success in patent infringement suit). The same result is warranted here.

### 8. NanoString's Proposed Counterclaim Counts 14, 15, and 16 Fail for the Same Reasons, as They Are All Derivative of Its Futile Sherman Act Counterclaim

Counts Fourteen, Fifteen, and Sixteen of NanoString's Counterclaims allege violations of California's unfair competition law, California's Cartwright Act, and Washington State's unfair trade practices laws. D.I. 119-1 ¶¶ 208-30. These counterclaims merely rehash of NanoString's defective federal antitrust counterclaim, and NanoString offers the Court no reason why these counterclaims would survive absent a viable Sherman Act counterclaim. *See, e.g., Wisconsin v. Indivior Inc.*, No. 13-MD-2445, 2017 WL 4642285, at *12 (E.D. Pa. Oct. 17, 2017) ("Multiple courts have dismissed state consumer protection and unfair trade practices claims that simply mirror deficient federal antitrust laws." (citing cases)); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act … was modeled after the Sherman Act."). Thus, all of these claims are equally futile.

## VI. CONCLUSION

For the reasons set forth above, NanoString's Motion (D.I. 119) should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Cameron P. Clark

_____
Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
cclark@morrisnichols.com

OF COUNSEL:

Matthew D. Powers
Paul T. Ehrlich
Stefani C. Smith
Robert Gerrity
Li Shen
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065

Samantha A. Jameson
Ronald J. Pabis
Kiley White
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102

10x_Harvard_NSTG_Service@tensegritylaw
group.com

*Attorneys for 10x Genomics, Inc.*


May 16, 2023

MORRIS JAMES LLP

/s/ Kenneth L. Dorsney

_____
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
Kdorsney@morrisjames.com
Chitch@morrisjames.com

OF COUNSEL:

Geoffrey M. Raux
Ruben J. Rodrigues
Michael J. Tuteur
Sarah E. Rieger
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA 02199
(617) 502-3284
(617) 502-3228
BOST-F-10Xv.Nanostring@foley.com

Sarah E. Rieger
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 319-7101
BOST-F-10Xv.Nanostring@foley.com


*Attorneys for President and Fellows of Harvard College*

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 16, 2023, upon the following in the manner indicated:

Brian E. Farnan, Esquire                           *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Nanostring*
*Technologies, Inc.*

Edward R. Reines, Esquire                          *VIA ELECTRONIC MAIL*
Derek C. Walter, Esquire
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065-1134
*Attorneys for Defendant Nanostring*
*Technologies, Inc.*

Amanda Branch, Esquire                             *VIA ELECTRONIC MAIL*
Christopher M. Pepe, Esquire
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC  20036
*Attorneys for Defendant Nanostring*
*Technologies, Inc.*

Natalie C. Kennedy, Esquire                        *VIA ELECTRONIC MAIL*
Yi Zhang, Esquire
Eric S. Hochstadt, Esquire
767 Fifth Avenue
New York, NY  10153-0019
*Attorneys for Defendant Nanostring*
*Technologies, Inc.*

Kenneth L. Dorsney, Esquire                          *VIA ELECTRONIC MAIL*
Cortlan S. Hitch, Esquire
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
*Attorneys for Plaintiff President and Fellows of*
*Harvard College*

Geoffrey M. Raux, Esquire                            *VIA ELECTRONIC MAIL*
Ruben J. Rodrigues, Esquire
Michael J. Tuteur, Esquire
Foley & Lardner LLP
111 Huntington Avenue, Suite 2500
Boston, MA  02199
*Attorneys for Plaintiff President and Fellows of*
*Harvard College*


/s/ Cameron P. Clark
_____
Cameron P. Clark (#6647)