# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>Plaintiffs,<br><br>vs.<br><br>NANOSTRING TECHNOLOGIES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. 22-261-MFK<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

     10x Genomics, Inc. and the President and Fellows of Harvard College have sued NanoString Technologies, Inc., a biotechnology company, for patent infringement. NanoString has moved for leave to file its second amended answer to assert five new counterclaims (counterclaims 13-17) and the affirmative defense of unclean hands. For the reasons stated below, the Court grants the motion, except with respect to counterclaim 17, which the Court dismisses.

## Background

     10x and NanoString are both biotechnology research companies specializing in single-cell spatial transcriptomics (SST). Both companies developed SST products designed to conduct spatial analysis of single-cell gene expression information. NanoString's product is called CosMx Spatial Molecular Imager, and 10x's product is called Xenium In Situ. In 2020, 10x acquired ReadCoor, Inc. ReadCoor was founded by Dr. George Church, a Harvard professor studying SST.

**A.     The NIH grant agreement**

In May 2009, Dr. Church and Harvard jointly applied for grant funding from the National Institutes of Health (NIH) for their proposed research center, the Center for Transcriptional Consequences of Human Genetic Variation (CTCHGV).  In the "Overview," the application explained that "[a]s a matter of principle, Professor Church strongly believes in open dissemination of knowledge and technology[] and is therefore committed to making CTCHGV innovations available to the larger research community: both directly through tools and methods for immediate use by individual researchers, and by technology transfer to industry, whereby companies incorporate the innovations into their products."  Dkt. no. 119-4, Grant Appl., at 117.

The application stated in its "Data and Materials Dissemination Plan" (DMDP) that "[i]n line with long-standing Church Lab commitments, we continue to champion concepts that we helped establish for the genome sequencing community that encourage rapid data deposition and technology transfer, such as 'Open Source Biology,'" the "goal" of which "is to prevent exclusive licenses from potentially interfering with technology transfer."  *Id.* at 130.  The application went on to state that "[i]n this regard," CTCHGV would "try to move our technology either into the public domain or non-exclusive licensing mechanisms well before they would be normally publishable."  *Id.*

The "Commercialization" subsection of the DMDP stated that "[a]s described above, CTCHGV will pursue open and non-exclusive licensing agreements that encourage innovations to be made widely available to researchers and commercial entities."  *Id.* at 131.  The subsequent sentence explains that "Professor Church has

2

been on the Harvard-wide Copyright and Patent Committee (CPC) for years, a recipient of numerous successful patents, and is in constant contact with the HMS Office of Technology Licensing (OTL)." *Id.*  The application then lists Professor Church's "[c]urrent company Scientific Advisory roles" and "[p]ast [c]ompanies licensing Church lab patents or software." *Id.*  In the following "Resource Sharing Plan" section, the application states that "[t]o broaden the availability to the research community of innovations developed by CTCHGV, the Church Lab will work with the Harvard Medical School Office of Technology Licensing to obtain open and non-exclusive licenses that will encourage commercialization of these innovations.  Please refer to the DMDP for additional details." *Id.* at 133.

In September 2010, the NIH accepted Harvard's grant application and awarded approximately $20 million dollars in research funding.  NIH's "Notice of Award" states that "[t]his award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions."  Dkt. no. 119-4, Notice of Award, at 1.  The notice further states that "[a]cceptance of this award including the 'Terms and Conditions' is acknowledged by the grantee when funds are drawn down or otherwise obtained from the grant payment system." *Id.*  In Section IV titled "HG Special Terms and Conditions," the notice states that "[c]ompliance with the data and materials sharing and release plans, described on pages 117-118 and 130-133 of the grant application is a condition of this award.  Failure to comply with these plans may result in termination of the award." *Id.* at 4.

**B.     The alleged anticompetitive scheme**

3

After NIH had funded the project, Dr. Church founded ReadCoor. Dr. Church and Harvard entered into an exclusive license agreement with ReadCoor, which included the patents 10x now asserts in this suit. The asserted patents were developed under the NIH grant funding "as stated in the specification of each asserted patent." Def.'s Motion at 3.

NanoString alleges that 10x and Harvard " jointly coordinated and agreed to pursue a monopoly in the SST market." Countercl. ¶ 180. NanoString explains that "Harvard and 10x committed to license the Asserted Patents non-exclusively," then engaged in "bait-and-switch" conduct by refusing to offer non-exclusive licenses. Def.'s Reply Br. at 10. In April 2023, NanoString requested from 10x and Harvard an offer to non-exclusively license the asserted patents, but they refused.

NanoString alleges that 10x advertises "that it is the 'established market leader in single cell genomics.'" Countercl. ¶ 199. NanoString further alleges that "10x touts that Xenium is 'built to be the *in situ* spatial biology leader.'" *Id.* The only other participant in the SST market is Vizgen, Inc., with its MERSCOPE product, and Harvard and 10x are "seeking an injunction to block [ ] MERSCOPE from the market" as well. *Id.* ¶ 185. If 10x and Harvard succeed in their infringement suits, they will have "100% share of the global SST market" and customers will be forced "to pay artificially inflated prices to 10x and Harvard for use of their SST product." *Id.* ¶ 207.

## Discussion

Federal Rule of Civil Procedure 15(a) "express[es] a preference for liberally granting leave to amend." *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000). "Nonetheless, a District Court may deny leave to amend on the grounds that

4

amendment would cause undue delay or prejudice, or that amendment would be futile." *Id.* 10x contends that NanoString's motion to amend should be denied because it is futile. "'Futility' means that" the counterclaims "would fail to state a claim upon which relief could be granted," under "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (internal quotation marks omitted). The complaint must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**A.    Counterclaim 17 (breach of contract)**

In counterclaim 17, NanoString claims that 10x and Harvard are liable for breaching the "Special Terms and Conditions" of the NIH grant, dkt. no. 119-4, Notice of Award, at 4, because Harvard refused to offer "open and non-exclusive licensing agreements" for the innovations the grant funded, dkt. no. 119-4, Grant Appl., at 131. NanoString seeks to enforce the NIH grant as a third-party beneficiary.

"Regional circuit law is applied to contractual disputes, including disputes

5

involving license agreements." *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1371 (Fed. Cir. 2008); *see also DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006) ("Interpretation of contract terms is a matter not unique to our exclusive jurisdiction and is therefore reviewed under regional circuit law.").[1] Neither party has argued that Federal Circuit law should apply to NanoString's breach of contract claim. Thus, the Court applies Third Circuit law.

As an initial matter, 10x contends that the NIH grant is not a contract. Neither party has cited, nor has the Court found, any Third Circuit case addressing the circumstances under which government grants can constitute enforceable contracts.[2] The Federal Circuit "treat[s] federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). To determine whether the standard conditions for a contract are met, the Federal Circuit "appl[ies] the traditional four-part test for the existence of a government contract: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Id.* at

---

[1] The Federal Circuit has made an exception to this general rule where "the relevant contract is one with the government, and the relevant question is the scope of the government's authorization and consent to suit, in lieu of a private defendant, for patent infringement" because this question bore "an essential relationship" to the Federal Circuit's "jurisdiction over patent cases" and "jurisdiction over appeals pertaining to government contract disputes." *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 n.3 (Fed. Cir. 2007). The question addressed in *Sevenson* is not present in this case, as no party here asserts that "the United States [i]s the proper defendant." *Id.* at 1364.

[2] In *Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54–55 (3d Cir. 1983) (per curiam), the Third Circuit referred to grants provided to private agencies by the federal government interchangeably as "grant agreements" and "government contracts" without discussion.

1339.

10x does not expressly address any of these elements. Rather, it contends that because the NIH grant "was made pursuant to 42 U.S.C. § 241," it is "governed by statute, not contract law." Pls.' Resp. Br. at 8–9 (quoting *Tavoloni v. Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 683 (S.D.N.Y. 1998), *aff'd*, 198 F.3d 235 (2d Cir. 1999)). *Tavoloni* is inapposite. In that case, the terms of the NIH grant award were "not subject to negotiation between the parties," so the Second Circuit interpreted the grant "by examining the relevant statute and regulations and not the parties' understanding." *Tavoloni v. Mount Sinai Med. Ctr.*, 198 F.3d 235, 1999 WL 972656, *2 (2d Cir. 1999). Here, by contrast, NanoString has alleged that the terms Harvard breached were provided not by any statute, but rather as part of Harvard and NIH's negotiation. NanoString alleges that Harvard offered to provide "open and non-exclusive licensing agreements," dkt. no. 119-4, Grant Appl., at 131, an offer that NIH then accepted and made a "special term and condition" of the award, dkt. no. 119-4, Notice of Award, at 4.

10x argues that 42 U.S.C. § 241 distinguishes between "grants-in-aid" and "contracts." But this section simply authorizes the Secretary to both "make grants-in-aid" and "enter into contracts." 42 U.S.C. §§ 241(a)(3), (a)(7). To the extent 10x is arguing that, even though the NIH was authorized to enter into a contract, the NIH did not actually intend its grant to Harvard to be enforceable as a contract, that is a factual issue that cannot be determined at this stage. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 263 (3d Cir. 2010) ("[W]hen the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.") (internal quotation marks omitted). For the same reason, the Court

7

disregards 10x's evidence regarding NIH's intent, namely, 10x's references to NIH's website that purportedly distinguishes between grants and contracts and the agency's policy that does not describe a breach of contract claim as an available remedy. The Court therefore need not address NanoString's contention that 10x relies on improper extrinsic evidence.

10x relies on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011), for the proposition that "the 'absence of a private right to enforce' would be rendered 'meaningless' if Courts allowed an end-run to such statutory frameworks by endorsing breach-of-contract claims by purported third-party beneficiaries." Pls.' Resp. Br. at 10 (quoting *Astra*, 563 U.S. at 118). But this analysis concerns NanoString's ability to enforce the NIH grant as a third-party beneficiary, discussed below, not whether a contract existed in the first place. Indeed, in *Astra*, the Supreme Court noted that "[t]he statutory and contractual obligations . . . are one and the same," not that no contractual obligations existed. *Astra*, 563 U.S. at 118. Moreover, *Astra* is distinguishable because it involved "form agreements" that "contain[ed] no negotiable terms." *Id.* In this case, as stated above, NanoString alleges that Harvard breached a term that it offered in its grant application, not terms that are contained in any statute or regulation.

10x contends that even if a contract existed, NanoString's interpretation of the claimed terms is implausible. The Court disagrees. In the "Commercialization" section of the grant application, it stated that the applicant "will pursue open and non-exclusive licensing agreements that encourage innovations to be made widely available to researchers and commercial entities." Dkt. no. 119-4, Grant Appl., at 131. Although 10x argues that this sentence does not explicitly mention patents, the rest of the

8

paragraph references Professor Church's role on the Harvard Copyright and Patent Committee and then lists companies that license "Church lab patents or software." *Id.* at 131–32.  In context, NanoString has plausibly alleged that Harvard promised to offer non-exclusive patent licenses, which NIH accepted by reference to those specific pages of Harvard's grant application.[3]

In short, NanoString has sufficiently alleged the existence of a contract between NIH and Harvard requiring Harvard to offer open and non-exclusive licensing agreements for patents funded by the grant.

For NanoString to be entitled to sue for breach, however, it must be a third-party beneficiary of the contract.  See *In re Frescati Shipping Co.*, 718 F.3d 184, 197 (3d Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 12, 2013) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his direct benefit." (quoting *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307 (1927))).  10x asserts, and NanoString does not dispute in its briefing, that federal common law applies to "contracts to which the government is a party." *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, N.A.*, 758 F.3d 592, 598 (5th Cir. 2014) ("It is well-established that government contracts are governed by federal common law.").

---

[3] 10x asserts in a footnote that "Harvard has entered into numerous non-exclusive licenses to patents that arose from the grant application at issue." Pls.' Resp. Br. at 6 n.5 (emphasis omitted).  "[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).  Even if the argument were not forfeited, it includes a factual assertion that cannot properly be considered at this juncture.

The Third Circuit "look[s] to the Restatement of Contracts for the federal law on third-party beneficiaries."  *In re Frescati*, 718 F.3d at 198.  "[G]overnment contracts . . . 'often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.'"  *Interface Kanner, L.L.C. v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir. 2013) (quoting Restatement (Second) of Contracts § 313(2) cmt. a).  "The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity."  *Astra*, 563 U.S. at 118 (quoting 9 J. Murray, *Corbin on Contracts* § 45.6 (rev. ed. 2007)).

> The Restatement provides that:
>
> [A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless
> (a) the terms of the promise provide for such liability; or
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement (Second) of Contracts § 313(2).  The Third Circuit has "held that plaintiffs could not be considered third-party beneficiaries of [ ] grant agreements" where the plaintiffs did not point to a "provision of the grant agreements" that provided that the party contracting with the government will be liable to the purported beneficiary "should it fail to perform."  *Nguyen*, 719 F.2d at 55; *see also McCullough v. Redevelopment Auth. of City of Wilkes-Barre*, 522 F.2d 858, 868 n.27 (3d Cir. 1975) ("Plaintiffs are not a party to that contract and cannot claim third party beneficiary status under a government contract absent an interest that they be compensated thereunder."); *Allstate Transp. Co.*

10

*v. Se. Pennsylvania Transp. Auth.*, No. CIV. A. 97-1482, 2000 WL 329015, at *16 (E.D. Pa. Mar. 27, 2000) ("The Court of Appeals for the Third Circuit has interpreted the Restatement to require that the contract at issue contain some specific language or provision reflecting the intent to make the party contracting with the government liable to third parties should it fail to perform.").

In this case, the NIH grant does not provide that Harvard is liable to any members of the public for breach of the "data and materials sharing and release plans." Dkt. no. 119-4, Notice of Award, at 4.  NanoString does not point to any provision of the NIH grant that plausibly "reflects the notion" that Harvard will be liable to NanoString should Harvard fail to perform.  *Nguyen*, 719 F.2d at 55.  Rather, the grant award specifically provides that "[f]ailure to comply with these plans may result in termination of the award," placing enforcement rights squarely with the NIH.  Dkt. no. 119-4, Notice of Award, at 4.

NanoString contends that it has sufficiently alleged that it is a third-party beneficiary by alleging that it "fall[s] within a class clearly intended to be benefited" by the data and materials sharing and release plans in the NIH grant agreement.  Def.'s Reply. Br. at 5 (quoting *Interface Kanner*, 704 F.3d at 933).  But *Interface Kanner* reiterates that "third parties to government contracts 'are generally assumed to be incidental beneficiaries'" and a showing of "clear intent" is necessary "[t]o overcome this presumption."  *Interface Kanner*, 704 F.3d at 933 (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir.1999)); *see also GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, N.A.*, 671 F.3d 1027, 1033–34 (9th Cir. 2012) (observing that the "clear intent hurdle is a high one" and "is not

satisfied by . . . even a showing that the contract operates to the third parties' benefit and was entered into with them in mind," but rather requires an examination of "the precise language of the contract") (alterations accepted) (citations and internal quotation marks omitted).

Moreover, as discussed above, Third Circuit law is controlling for this issue, and NanoString does not argue otherwise. In *Nguyen*, the United States "contract[ed] with agencies such as the United States Catholic Conference (U.S.C.C.) to continue their aid to refugees." *Nguyen*, 719 F.2d at 54. Although the plaintiffs, as refugees, fell within a class clearly intended to be benefited by the resulting grant agreements, the district court reasoned that "[s]omething more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract." *Liem Duc Nguyen v. U.S. Cath. Conf.*, 548 F. Supp. 1333, 1348 (W.D. Pa. 1982), *aff'd sub nom. Nguyen*, 719 F.2d 52; *see also Jama v. U.S. I.N.S.*, 334 F. Supp. 2d 662, 687 (D.N.J. 2004) ("Under *Nguyen*'s application of the Restatement approach, members of the public may not sue as third party beneficiaries of government contracts unless the contract contains specific language providing them with the right to do so.").

In sum, NanoString has not plausibly alleged that it is a third-party beneficiary of the NIH grant agreement. Thus, the Court denies NanoString's motion for leave to assert its breach of contract claim (counterclaim 17) because the claim is futile. In light of this holding, the Court need not address 10x's additional arguments that any obligations from the NIH grant terminated in 2016 and that 10x, as a nonparty to the NIH grant, cannot be held liable for breach.

B.   **Counterclaim 13 (attempted monopolization)**

NanoString also seeks leave to assert a claim under section 2 of the Sherman Act for attempted monopolization. "A claim of attempted monopolization under § 2 of the Sherman Act must allege (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) (internal quotation marks omitted).[4]  10x contends that this claim is futile for several reasons.

1.   **Anticompetitive conduct**

First, 10x argues that NanoString has failed to allege any anticompetitive conduct. "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* at 308. "[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308. "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive." *Id.*

NanoString alleges that 10x and Harvard engaged in anticompetitive conduct by

---

[4] Both parties cite Third Circuit law, and neither contends that another circuit's law should apply, so the Court applies Third Circuit law to NanoString's federal antitrust claim.  See *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) ("[P]arties may waive choice-of-law issues.").

13

"reneging on a promise to license a patent on a non-exclusive basis."  Def.'s Reply Br. at 6.  NanoString relies on *Broadcom* for the proposition that this conduct is actionable.  In *Broadcom*, the Third Circuit held that "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND [free, reasonable, and non-discriminatory] terms, (3) coupled with an SDO [standards-determining organization]'s reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct."  *Broadcom*, 501 F.3d at 314.

The Third Circuit explained that its holding followed from the harm of "patent hold-up" that can be caused by "[d]eceptive FRAND commitments."  *Id.*  "[P]atent hold-up" can occur when "[i]ndustry participants who have invested significant resources developing products and technologies that conform to the [SDO's] standard will find it prohibitively expensive to abandon their investment and switch to another standard."  *Id.* at 310.  Because industry participants are "locked in" to the standard, the patent holder is in a "unique position of bargaining power" and "may be able to extract supracompetitive royalties from the industry participants."  *Id.*  In these circumstances, the Third Circuit observed that "measures such as FRAND commitments," i.e., commitments to license technologies on "fair, reasonable, and non-discriminatory" terms, "become important safeguards against monopoly power."  *Id.* at 304, 314.

Similar to *Broadcom*, NanoString alleges that 10x and Harvard engaged in deceptive, "bait-and-switch" conduct by "reneging on a promise to license."  Def.'s Reply Br. at 6, 10.  NanoString further alleges that "10x and Harvard are pursuing an ill-

14

gotten monopoly by enforcing patents that are subject to a requirement that they be licensed non-exclusively." Def.'s Motion at 4. NanoString has also plausibly alleged that this scheme, if successful, will provide 10x and Harvard monopoly power to "force customers in the SST market to pay artificially inflated prices." Countercl. ¶ 207. These allegations plausibly suggest that 10x competed with NanoString "on some basis other than the merits" and are sufficient at this stage to allege anticompetitive conduct. *W. Penn Allegheny*, 627 F.3d at 110 ("Viewed as a whole, these allegations plausibly suggest that UPMC has engaged in anticompetitive conduct, *i.e.*, that UPMC has competed with West Penn on some basis other than the merits.") (internal quotation marks omitted); *see also LePage's*, 324 F.3d at 152 ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998)).

10x contends that *Broadcom* is inapposite because Harvard did not make its promise to a standard-setting organization. But 10x has not cited any case holding that a standard-setting organization is required to establish anticompetitive patent hold-up.[5] *See Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-CV-00923-BLF, 2018 WL 11230167, at *14 (N.D. Cal. May 21, 2018) ("Cisco does not point to any authority that concluded that an anticompetitive 'open early, closed late' scheme necessarily requires

---

[5] 10x cites *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 36371, at *8 & n.7 (E.D. Pa. Jan. 4, 2017), for the proposition that "*Broadcom* was decidedly narrow and its applicability is confined to its unique factual circumstances." Pls.' Resp. Br. at 19 (quoting *id.*). But the court in that case nonetheless held that the plaintiff's allegations of deceptive conduct "may be considered as one aspect of the overarching scheme claim alleged" and that "discovery will determine" whether the plaintiff's theory will ultimately prevail. *Id.* at *9.

intellectual property 'hold-up' or 'lock-in' of standards set by an SSO."). In *Arista*, the court held that there was "a genuine issue of material fact whether Cisco's [technology] was marketed as an industry standard" because there was evidence that "Cisco ha[d] previously represented that '[its technology] is the current de-facto standard.'" *Id.* (alterations accepted). Similarly, in this case, NanoString has alleged that 10x advertises its product as "built to be the *in situ* spatial biology leader" and that it is the "established market leader in single cell genomics." Countercl. ¶ 199.

10x also attempts to distinguish *Broadcom* by contending that NanoString does not allege "that the Asserted Patents are 'essential' to competing in the SST market." Pls.' Resp. Br. at 19. But NanoString does allege that 10x and Harvard's conduct, including obtaining an injunction against NanoString's infringement of their asserted patents, has prevented NanoString from competing in the SST market. *See, e.g.*, Countercl. ¶ 186 ("If Harvard and 10x's conduct is permitted to continue, competition in the SST market will be destroyed."); Def.'s Reply Br. at 10.

Finally, 10x argues that NanoString's theory of anticompetitive conduct fails because "NanoString never had a right to the license" given that it cannot enforce the NIH grant. Pls.' Resp. Br. at 18 (emphasis omitted). But the Third Circuit's analysis in *Broadcom* did not hinge on the legal right of competitors to a license, but rather the deceptive conduct that had anticompetitive effects. *See Broadcom*, 501 F.3d at 310–14. As explained above, NanoString has alleged similar deceptive conduct in this case.

2.  **Dangerous probability of monopoly power**

Next, 10x contends that NanoString has failed to allege the third element, a dangerous probability of achieving monopoly power. "[W]hether the Complaint alleged

16

sufficient facts as to the dangerous probability" element is "a particularly fact-intensive inquiry" that "[c]ourts typically should not resolve . . . at the pleading stage unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law." *Id.* at 318 (internal quotation marks omitted). "In a determination of dangerous probability . . . factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered." *Id.*

Rather than address any of these factors, 10x contends that NanoString's allegations that 10x and Harvard will have a monopoly if they succeed in their patent litigation cannot constitute a dangerous probability of achieving monopoly power as a matter of law because "any monopoly so achieved will be a legal one." Pls.' Resp. Br. at 19 (emphasis omitted). This contention is circular. The cases 10x relies on for this proposition do not address allegations akin to NanoString's in this case of a broader anticompetitive scheme in which patent litigation plays an enforcement role. *See Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 65 (D. Mass. 2020) (holding that "[r]egarding the showing of a dangerous probability of achieving monopoly power, the litigation itself cannot serve as the predicate anticompetitive harm under *Noerr-Pennington*"); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058, at *4–5 (N.D. Cal. Jan. 3, 2006) (holding that the defendant had "not alleged facts showing a dangerous probability of success" where its allegations "depend[ed] on the assertion" that the plaintiff's "patents were fraudulently procured"). The Court therefore overrules 10x's contention that NanoString cannot meet the

dangerous probability element as a matter of law.

Lastly, 10x contends that "[a]n attempted monopolization claim cannot be asserted against Harvard because it is not a competitor" in the SST market.  Pls.' Resp. Br. at 16.  Harvard's participation in the market is also relevant to the third element, a dangerous probability of achieving monopoly power.  *See Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994) ("Plaintiffs must thus show that the defendants possessed sufficient market power to come dangerously close to success within that market.") (internal quotation marks omitted).

10x asserts that NanoString alleges that there are only three SST market participants:  NanoString, Vizgen, and 10x.  But this misrepresents NanoString's allegations, which explain that "10x and Harvard, as exclusive licensee and licensor, jointly coordinated and agreed to pursue a monopoly in the SST market."  Countercl. ¶ 180.  In other words, NanoString contends that Harvard seeks to gain monopoly power through its licenses.  See *Magnetar Techs. Corp. v. Intamin, Ltd.*, No. CV071052GAFJWJX, 2011 WL 13133973, at *7 n.3 (C.D. Cal. May 11, 2011) ("[A]t least in theory, a patent-holder might wield monopoly power—i.e. the power to control prices or exclude competition—through its licensing program.").  Moreover, the "dangerous probability" element, as explained above, is a fact-intensive issue.  It is premature to resolve at this stage which party, if any, holds monopoly power in the SST market.  *See id.* at *7 ("To the extent that Intamin contends that Intrasys or some other entity holds the monopoly power, that is a matter that can be resolved as a matter of fact through the discovery process.").

In sum, the Court concludes that NanoString's attempted monopolization

counterclaim states a claim and thus grants NanoString's motion for leave to assert the claim.

The Court also grants NanoString's motion for leave to assert its affirmative defense of unclean hands.  NanoString contends that this defense is based on the same alleged anticompetitive conduct, and 10x never expressly addresses the defense.

**C.    Counterclaims 14-16 (state law claims)**

Lastly, counterclaims 14, 15, and 16 allege violations of California's Cartwright Act and the unfair competition laws of California and Washington.  10x only contends that these claims are futile because they "merely rehash [ ] NanoString's defective federal antitrust counterclaim."  Pls.' Resp. Br. at 20.  Because the Court grants NanoString's motion for leave to assert its federal antitrust claim, it also grants NanoString's motion with respect to these counterclaims.[6]

## Conclusion

For the reasons stated above, the Court grants NanoString's motion for leave to amend but denies the motion [dkt. no. 119] with respect to counterclaim 17.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 10, 2023

---

[6] The Court thus need not address NanoString's contention that its "state law claims do not depend on the Sherman Act claim."  Def.'s Reply Br. at 8.